IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BARBARA BLASKO                    §
                                  §
VS.                               §        ACTION NO. 4:21-CV-698-Y
                                  §
THOMAS D. MILLER, et al.          §

## OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

Before the Court is a motion for summary judgment (doc. 71) filed by defendants West Virginia Department of Administration ("the DOA") and West Virginia Public Employee Insurance Agency ("PEIA") (collectively "the Agency Defendants"), and a motion for partial summary judgment (doc. 53) filed by defendant Thomas Miller. For the reasons set forth below, the motions will be granted.

## BACKGROUND

This case arises out of Plaintiff's practice of medicine at Medical City Weatherford in Weatherford, Texas.[1] In addition to her providing normative physician medical treatment at the hospital, Plaintiff provided off-site, online medical services for companies that engage in telemedicine. As a result of Plaintiff's

---

[1] The factual statements that follow are drawn from Plaintiff's allegations in her original complaint. The statements are, therefore, not the findings of the Court.

providing online services, defendant Thomas Miller, acting as a privacy and security officer for the Agency Defendants, contacted Medical City Weatherford and stated that Plaintiff was potentially engaged in the unlawful distribution of prescription drugs as part of a widespread fraudulent-prescription scheme orchestrated by a Russian prescription pill mob in Miami, Florida. Miller also communicated these allegations to other members of the medical community who knew Plaintiff. As a result of Miller's allegations, Plaintiff alleges that she was forced to resign her employment and forego the remainder of her contract.

Plaintiff vehemently denies Miller's allegations and alleges that they are false and unfounded. Accordingly, she sued Miller in both his official and individual capacities, as well as the Agency Defendants, for defamation and tortious interference with her existing employment contract.

The Agency Defendants and Miller now move for summary judgment as to Plaintiff's claims. The motions are ripe for the Court's consideration.

## LEGAL STANDARD

Summary judgment is appropriate if the movant establishes, through the pleadings, affidavits, admissions on file, or other admissible evidence, that there is no genuine dispute of material

fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is "material" if it could change the outcome of the litigation. *Anderson*, 477 U.S. at 248. And a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A court should view the evidence in the light most favorable to the nonmovant but need not comb through the record in search of evidence creating a genuine issue of material fact. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). A defendant moving for summary judgment on an affirmative defense must show that no reasonable trier of fact could find other than for the defendant; otherwise, there is a genuine issue of fact, and summary judgment cannot be granted. *See Anderson*, 477 U.S. at 248.

## ANALYSIS

Defendants each move for summary judgment separately as **to** the entirety of Plaintiff's claims. Each motion is addressed in turn.

## I.   The Agency Defendants' Motion for Summary Judgment

The Agency Defendants move for summary judgment on two primary grounds: (1) the applicable statutes of limitations and

(2) sovereign immunity under the Eleventh Amendment.[2] The Court addresses each below and concludes that both grounds are dispositive of Plaintiff's claims.

### A.   The statutes of limitations

First, the Agency Defendants argue that Plaintiff's claims are time-barred under the applicable limitations statutes. They are correct.

Plaintiff pleads two separate causes of action: defamation and tortious interference with a contract. Under Texas law, a one-year limitations period governs defamation claims. *See* TEX. CIV. PRAC. & REM. CODE § 16.002(a).[3] And a two-year limitations period governs tortious-interference claims. *N. Tex. Opportunity Fund L.P. v. Hammerman & Gainer Int'l, Inc.*, 107 F. Supp. 3d 620, 635 (N.D. Tex. 2015) (Solis, J.) (citing *First Nat'l Bank v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986)).

The parties agree that the conduct giving rise to Plaintiff's

---

[2] The Court notes that the Agency Defendants also raise other arguments regarding why they are deserving of judgment as a matter of law, including the affirmative defense of truth as to Plaintiff's defamation claim, and the lack of an underlying tort and Plaintiff's voluntary resignation as to her tortious-interference claim. Given that the Court views the limitations and immunity arguments as dispositive of Plaintiff's claims against the Agency Defendants, it declines to address the remaining arguments.

[3] Federal courts sitting in diversity apply state substantive law and federal procedural law. *Block v. Tanenhaus*, 867 F.3d 585, 589 (5th Cir. 2017); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Because a statute of limitations is substantive under *Erie*, federal courts apply state statutes of limitations and related state law governing tolling of the limitations period. *See Guar. Tr. Of N.Y. v. York*, 326 U.S. 99, 110 (1945).

claims occurred on April 9, 2019. See doc. 72, at 5; see also doc. 74, at 10. Consequently, the parties agree that the deadlines for Plaintiff to bring her claims were September 15, 2020, for her defamation claim[4], and April 9, 2021, for her tortious-interference claim. See doc. 72, at 7; see also doc. 74, at 11. But Plaintiff filed this suit on May 28, 2021. See doc. 1. Accordingly, there is no dispute that Plaintiff's claims are facially time-barred.

However, Emergency Order Forty issued by the Texas Supreme Court authorizes courts to use their discretion to "modify or suspend" statutory deadlines "for a stated period ending no later than October 1, 2021." FORTIETH EMERGENCY ORDER REGARDING COVID-19 STATE OF DISASTER, 629 S.W.3d 911, 912 (Tex. 2020). In Plaintiff's own words, the inquiry here, then, is "whether the Court should exercise its discretion under Emergency Order 40" to extend the applicable limitations deadlines to May 28, 2021. (Doc. 74, at 11–12).

Emergency Order Forty is silent as to the methodology that the Court should use in exercising its discretion to extend a limitations period. See EMERGENCY ORDER, 629 S.W.3d at 912. But

---

[4] While this deadline is beyond the one-year limitations period for defamation claims, the parties concur that Emergency Order No. 21 issued by the Texas Supreme Court extended the limitations deadline to September 15, 2020, because her initial limitations deadline fell between March 13, 2020, and September 1, 2020. *See* TWENTY-FIRST EMERGENCY ORDER REGARDING COVID-19 STATE OF DISASTER, 609 S.W.3d 128, 129 (Tex. 2020).

Plaintiff directs the Court to the decision of the United States District Court for the Southern District of Texas in *Curry v. Valentin* for guidance. See No. 4:21-CV-02800, 2022 WL 3903115, at *6 (S.D. Tex. July 11, 2022), *report and recommendation adopted*, 2022 WL 3903135 (S.D. Tex. Aug. 2, 2022). In *Curry*, the court assessed whether the plaintiffs articulated a reason why such an extension would be appropriate in that case, focusing particularly on any specific COVID-19-related challenges that could explain the untimely filing of suit. *Id.*

With this guiding principle in mind, the Court first turns to Plaintiff's contention that her delay in filing suit was specifically caused by COVID-19-related difficulties arising out of her occupation as an emergency medicine physician. (Doc. 74, at 12.) Plaintiff argues that this created day-to-day stress that made it "impossible" for her to initiate this suit prior to May 28, 2021.

While the Court acknowledges the immense stress that members of the medical community faced during the pandemic, it cannot conclude that such difficulties prevented Plaintiff from contacting a lawyer, having the lawyer draft a notice-pleading compliant document, and filing that document via the Court's electronic-filing system. These acts do not require an in-person appearance, or any conduct that would compromise one's health due

to the risks associated with COVID-19. This is particularly true when there is undisputed evidence in the record that a lawyer representing Plaintiff throughout the investigation into the fraud scheme had knowledge of the potentiality of her legal claims as early as April 2019. See doc. 73-1, at 114, highlighting a portion of Plaintiff's deposition where she confirms that her lawyer at the time, Robert Frank, was aware of the purportedly actionable statements that Miller made as early as April 2019, a pre-pandemic date.

The Court thus views this tenuous connection between Plaintiff's COVID-19-related difficulties and her failure to timely file suit as insufficient for the Court to exercise its discretion under Emergency Order Forty to extend the limitations deadlines for Plaintiff's claims. Therefore, they are time-barred, and the Agency Defendants are entitled to summary judgment on their statutes-of-limitations defense.

**B.    Sovereign immunity under the Eleventh Amendment**

In addition to asserting the time-barred status of Plaintiff's claims, the Agency Defendants argue that they are entitled to sovereign immunity under the Eleventh Amendment. They are correct.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not

be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. This means that Eleventh Amendment sovereign immunity normally bars private suits against nonconsenting states in federal court, unless the state has waived sovereign immunity or Congress has expressly abrogated it. *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011); *see also AT&T Commc'ns v. Bellsouth Telecomms. Inc.*, 238 F.3d 636, 644–45 (5th Cir. 2001). And even if the state itself is not a named defendant in the suit, immunity still extends to its agencies where the state is the real party in interest. *See Ford Motor Co. v. Dep't of Treas.*, 323 U.S. 459, 463–64 (1945), *overruled on other grounds by Lapides v. Bd. Of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 623 (2002). So where agencies are merely alter egos of the state, it follows that Eleventh Amendment immunity shields them as well. *See Huber, Hunt & Nichols v. Architectural Stone Co.*, 625 F.2d 22, 24 n.6 (5th Cir. 1980).

To determine whether an agency is an alter ego of the state, district courts within the jurisdiction of the United States Court of Appeals for the Fifth Circuit rely on a factor-based analysis established in *Huber* and fully developed in *Tradigrain, Inc. v. Mississippi State Port Authority*. *See id.*; *see also* 701 F.2d 1131,

1132–33 (5th Cir. 1983). If an agency's status is unclear, the court must look to any and all available sources for guidance. *Tradigrain, Inc.*, 701 F.2d at 1132. A factor that "subsumes all others" is the treatment of the agency by its state's courts. *Id.* But outside of state-court treatment, the Court may consider whether: (1) the agency has been granted the right to hold and use property; (2) it has the express authority to sue or be sued in its corporate name; or (3) it has independent management authority. *Id.* Further, the Court can also consider: (4) whether the state is responsible for the agency's debts; (5) whether the agency is primarily concerned with local, as opposed to statewide problems; or (6) the degree of general financial autonomy of the agency. *Id.* (citation omitted).[5] The Court will first address West Virginia state-court treatment of the Agency Defendants, then it will discuss all other factors.

> *(1)   West Virginia courts' treatment of the Agency Defendants*

Plaintiff argues that the courts of West Virginia treat the Agency Defendants as separate and distinct entities from the state.[6] In support of her argument, Plaintiff relies on the

---

[5] As the court noted in *Tradigrain*, some factors will likely suggest that the agency is independent, while some cut the other way and support its alter-ego status. *Id.* at 1133. But the court must never lose sight of the primary question—whether the state is the real party in interest in the lawsuit nominally brought against the agency. *Id.*

[6] Some of Plaintiff's briefing on this argument derives from her response

testimonies of the representatives of the Agency Defendants, wherein both indicated that the agencies could sue and be sued in their own names.

As for PEIA's representative, he testified that he believes the agency can sue and be sued in its own name based on his receiving lawsuits with PEIA's name in the case style. See doc. 66-2, at 31–32. And the DOA's representative testified that he believes that the agency could also be sued "as a department as a governmental subdivision." (Doc. 66-3, at 6). Notwithstanding these bare admissions, the parties have been unable to provide the Court with a decisional case on point that conclusively determines that the DOA or PEIA are independent agencies of the State of West Virginia. See doc. 66, at 7, stating "Defendants have not cited any cases from West Virginia courts dealing with the alter ego status of either of the Agencies, and Dr. Blasko has not been able to find any."

Therefore, the Court considers the testimony of these

---

to the Agency Defendants' motion to dismiss for lack of jurisdiction. See doc. 66. The Court nonetheless considers Plaintiff's briefing here because, as the Fifth Circuit noted in *Tradigrain*, "the analysis of an agency's status is virtually identical whether the case involves a determination of immunity under the eleventh amendment or a determination of citizenship for diversity jurisdiction." 701 F.2d at 1132. Therefore, the Court believes it fair to consider the totality of the record and briefing to fully evaluate the merits of this argument. *See Morris v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (indicating that a court should consider the entire record in conducting a summary-judgment analysis, including other filed papers when they are relevant.)

representatives as a factor favoring the independence of the Agency Defendants, but these allegations, which lack any supporting case law, fall short of proving that West Virginia courts treat the agencies as separate and distinct entities.

To further support her argument, Plaintiff directs the Court's attention to a decision from the United States District Court for the Southern District of West Virginia, where PEIA was a named defendant. *See Morrison v. Standard Ins. Co., et al.*, No. 2:10-CV-156, 2010 WL 3703036 (S.D. W. Va. Sept. 16, 2010). While not directly on point, Plaintiff argues that *Morrison* aligns with the spirit of West Virginia law on the issue of whether PEIA is a separate and distinct agency from the state itself.

In *Morrison*, the court held that a plaintiff's claims against PEIA were not barred because the recovery sought was under and up to the limits of the state's liability insurance coverage, which fell outside of the traditional immunity bar of suits against the state. *Id.*, at *6. The court reasoned that, because the claims targeted the state insurance policy and not state funds, they were exempt from "the constitutional immunity otherwise afforded to the State." *Id.*, at *5. This, Plaintiff contends, is indicative that the courts of West Virginia treat at least PEIA, if not both Agency Defendants, as separate and distinct entities because they are insured against defamation and tortious-interference claims, and

this policy waives normative immunity. See doc. 67-1, at 157–206, for the applicable insurance policy.

However, Plaintiff fails to recognize that the Fifth Circuit considered this exact negative-inference argument in *Tradigrain* and refused to recognize its validity. In that case, Judge Thornberry dissented and adopted Plaintiff's stance, arguing that the majority's emphasis on a Mississippi statutory waiver of immunity, identical to the West Virginia waiver in *Morrison*, was misplaced. *See Tradigrain*, 701 F.2d at 1134 (Thornberry, J., dissenting). In doing so, Judge Thornberry made a similar observation, which Plaintiff argues is dispositive here: by exposing the agency at issue to liability under its insurance policy for daily business activity, the state legislature revealed its perception of the agency as an independent entity rather than an arm of the government. *Id.* As Judge Thornberry stated, "[w]here immunity from suit is the hallmark of an agency inseparable from the state it serves, an explicit waiver of immunity can only operate to sever that agency from the state." *Id.*

Similar to the majority in *Tradigrain*, the Court concludes that the inverse is more true as to the laws of the State of West Virginia. The West Virginia legislature "necessarily must have intended that the . . . [Agency Defendants] enjoy sovereign immunity. Otherwise, it would not have been concerned with waiving

that immunity to the extent that insurance was purchased." *Id.* at 1133. Therefore, Plaintiff's argument is unpersuasive. And while there is no West Virginia case law directly on point, the Court construes this factor in favor of the Agency Defendants' statuses as alter egos in light of the *Morrison* case and the Fifth Circuit's decision in *Tradigrain*.

### (2)   All other factors

In addition to the merely implicit—but still favorable—state-court treatment, the Agency Defendants rightfully note that their enabling acts evince powers and responsibilities that are more compatible with alter egos of the state rather than independent agencies.[7]

After the court in *Tradigrain* found no constitutional or decisional law on point, it considered the enabling act of the agency at issue to determine whether its legislatively mandated powers were indicative of independent or alter-ego status. *Id.* Correspondingly, the Court evaluates the enabling acts of the DOA and PEIA (and testimony regarding those enabling acts) to determine the intent of the West Virginia legislature in creating the

---

[7] Similar to Plaintiff's argument on state-court treatment, the Agency Defendants' briefing on this point is found in its first amended motion to dismiss (doc. 51) and the supplemental brief supporting that motion (doc. 59). The Court nonetheless considers their argument here as it is indicative of whether they are entitled to sovereign immunity under the Eleventh Amendment.

agencies.

Regarding the DOA, its enabling provisions are found in §§ 5A-1-1, et seq., of the West Virginia Code. There are two attributes of the DOA that are indicative of its status as an alter ego of the State of West Virginia.

First, the head of the DOA is the cabinet secretary, which is a cabinet-level position, who is appointed by the governor with advice and consent of the state senate. See W. Va. Code § 5A-1-2(a). In the words of the legislature, the secretary "serves at the will and pleasure of the governor." *Id.* § 5A-1-2(c). The secretary is required to make an annual report to the governor concerning "the conduct of the department and the administration of the state finances as they pertain to programs administered" by the DOA. *Id.* § 5A-1-5. Further, the secretary, division heads of the DOA, and its employees are only authorized to perform duties that are statutorily authorized by the legislature, or such other duties as the governor may prescribe. *Id.* § 5A-1-3. It follows, then, that the DOA, acting through its secretary, division heads, and employees, possesses virtually no discretion in exercising its authority independently of the governor or legislature.

Second, as for its financial autonomy, any property owned or held by the DOA is ultimately the property of the State of West Virginia, which is funded via its taxpayers. See doc. 52-1, at 12.

The DOA also does not have its own bank account, and its expenses are covered through the state budget office. *Id.*, at 15. All employees of the DOA are employees of the State of West Virginia, who are paid using checks bearing the West Virginia seal and drawn on the funds held by the state treasury. *Id.* These statutory components favor a finding that the DOA is an alter ego of the State of West Virginia.

Similarly, regarding PEIA, its enabling provisions are found in §§ 5-16-1, et seq., in the West Virginia Code. There are three components of PEIA's enabling provisions that indicate its alter-ego status. First, PEIA is one of the sixteen subdivisions of the DOA, which means that it must follow the directives of the cabinet secretary, statutory mandates, and the governor. *Id.*, at 11. Analogous to the secretary of the DOA, the head of PEIA is the director, who is also appointed by the governor and confirmed by the senate. *See* W. Va. Code § 5-16-3(a). Second, PEIA is financed via appropriated funds from the state treasury, and the state treasurer and auditor must approve the expenditures of the agency. *See* (doc. 52-1), at 19-20. Third, just like the DOA, employees of PEIA are paid using checks bearing the state seal. *Id.*, at 20. These components militate strongly toward a conclusion that PEIA is also an alter ego of the state.

      *(3)   Waiver*

One final consideration is the issue of waiver. The Supreme Court has stated that a state creates an exception to the normative immunity bar when it waives its sovereign immunity by expressly consenting to suit. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) (citing *Clark v. Barnard*, 108 U.S. 436, 447–48 (1883)). To do so, the state must either: (1) voluntarily invoke the jurisdiction of federal courts, or (2) make a "clear declaration" that it intends to submit itself to federal jurisdiction. *Id.* at 675–76 (citations omitted.)

Plaintiff argues that, because the Agency Defendants are subjected to a waiver of immunity under West Virginia law up to the limits of the applicable insurance policy, which allows them to be sued in state court, they have also consented to suit in federal court.

This is an incorrect statement of the law. In *College Savings Bank*, the Supreme Court declared that "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." *Id.* at 676 (citing *Smith v. Reeves*, 178 U.S. 436, 441–45 (1900)). Indeed, the state does not "consent to suit . . . merely by stating its intention to 'sue and be sued.'" *Id.* Here, the language in the immunity waiver applicable to the Agency Defendants, § 29-12-5(a)(4), does not explicitly expose

them to federal-court jurisdiction. *See* W. Va. Code § 29-12-5(a)(4). This is equally supported in case law, given that the United States District Court for the Southern District of West Virginia has acknowledged that § 29-12-5 does not serve as a direct waiver of sovereign immunity under the Eleventh Amendment. *Wriston v. W. Va. Dep't of Health & Human Res.*, No. 2:20-CV-00614, 2021 WL 4150709, at *9 (S.D. W. Va. Sept. 13, 2021). Thus, Plaintiff's waiver argument fails.

*   *   *

At bottom, the implicit but favorable state-court treatment of the statuses of the Agency Defendants and the language of their enabling acts strongly suggest that the West Virginia legislature created the DOA and PEIA as arms of the state. And the State of West Virginia has not explicitly waived its immunity and subjected itself to federal jurisdiction. The Court, therefore, concludes that the Agency Defendants are entitled to sovereign immunity under the Eleventh Amendment. Accordingly, the Agency Defendants' motion for summary judgment (doc. 71) will be granted on this ground as well.

## II.  Miller's Motion for Summary Judgment

Defendant Miller moves for summary judgment as to Plaintiff's

claims against him on several grounds.[8] First, he contends that Plaintiff's claims are time-barred. Second, he asserts that, as an employee of PEIA, Plaintiff's claims against him in his official capacity are barred by sovereign immunity. Third, as for Plaintiff's claims against him in his individual capacity, Miller argues that official immunity shields him from liability. Finally, he avers that that judicial-proceedings privilege bars Plaintiff's claims since his allegedly defamatory remarks occurred during the pendency of an investigation that could have prompted a judicial proceeding.

The Court addresses each in turn and determines that each is dispositive of Plaintiff's claims against Miller.

### A.    The statutes of limitations

First, Miller argues that both of Plaintiff's claims against him—defamation and tortious interference—were filed beyond the applicable statutory deadlines and are, therefore, time-barred. Plaintiff's response to Miller's argument is identical to her response to the Agency Defendants' limitations argument, which is that the Court should exercise its discretion under Emergency Order

---

[8] Like the Agency Defendants, Miller also raises additional arguments addressing Plaintiff's claims individually: the affirmative defense of truth as to her defamation claim; and the lack of an underlying tort and Plaintiff's voluntary resignation that would arguably negate her tortious-interference claim. The Court chooses to only address the arguments that it views as legally dispositive of the totality of her claims against Miller, especially given the fact-intensive nature of the "truth" and "voluntary resignation" defenses.

Forty to toll the limitations periods for her claims based on the stress she experienced as a frontline medical professional during the COVID-19 pandemic.

For the reasons articulated as to the application of statutes of limitations to the claims against the Agency Defendants, the Court declines to exercise its discretion under Emergency Order Forty to extend the deadlines for Plaintiff's claims. Accordingly, Plaintiff's claims against Miller are time-barred, and he is deserving of summary judgment on his limitations argument.

**B.   Sovereign immunity on official-capacity claims**

Second, insofar as Plaintiff asserts claims against Miller in his official capacity as a privacy and security officer for PEIA, Miller contends that the claims are barred by sovereign immunity under the Eleventh Amendment. He is correct.

Eleventh Amendment immunity extends to state officials who are sued in their official capacities because such a suit is actually one against the state itself. *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). However, private citizens may bring suits against these state officials if they fall into the narrow exception articulated by the Supreme Court in *Ex Parte Young*. *Id.* at 405 (citing *Ex Parte Young*, 209 U.S. 123, 160 (1908)). The *Young* exception "has been accepted as necessary to permit the federal courts to vindicate

federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Id.* at 406 (citation omitted.) But a prerequisite to the applicability of the *Young* exception is the vindication of *federal* rights. *See id.* (Emphasis added.) Therefore, it does not apply to state-law claims brought against a state. *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)).

In response to Miller's invocation of sovereign immunity, Plaintiff raises an identical waiver-of-immunity argument that she relies on against the Agency Defendants, contending that Miller cannot be shielded by immunity since the Agencies waived it. As discussed above, the State of West Virginia did not expressly waive sovereign immunity under the Eleventh Amendment as to the agencies. And Plaintiff's claims are state-law claims against the State of West Virginia, so the *Young* exception does not apply. As a result, Miller is shieled by sovereign immunity to the extent that Plaintiff brings claims against him in his official capacity. He is, therefore, entitled to summary judgment on this point.

### C.   Official immunity on individual-capacity claims

Third, because Plaintiff alternatively brings her claims against Miller in his individual capacity, Miller asserts that official immunity protects him from liability. He is, again, correct.

Official immunity is an affirmative defense that protects government employees from personal liability. *Univ. of Hous. V. Clark*, 38 S.W.3d 578, 581 (Tex. 2000). A government employee is entitled to official immunity: (1) for the performance of discretionary duties, (2) within the scope of the employee's authority, and (3) provided that the employee acts in good faith. *Id.* (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994)). Given that official immunity is an affirmative defense, the employee official must conclusively prove each element of it to obtain summary judgment in his favor. *See id.* (citing *Kassen v. Hatley*, 887 S.W.2d 4, 8–9 (Tex. 1994)); *see also Anderson*, 477 U.S. at 248.

Each element is discussed in turn.

*(1)  Performance of a discretionary duty*

Regarding the first element, Miller argues that his communications to Plaintiff's employer and participation in PEIA's investigation of healthcare fraud were discretionary duties, not ministerial ones. Plaintiff does not contest this assertion. See doc. 67, at 10.

An act is discretionary if it involves personal deliberation, decision, and judgment. *Chambers*, 883 S.W.2d at 654. Conversely, actions that require obedience to orders or the performance of a duty to which the actor has no choice are ministerial. *Id.* Texas

law is settled that investigating and acting on gathered facts are quasi-judicial actions involving the exercise of discretion by their very nature. *Koerselman v. Rhynard*, 875 S.W.2d 347, 351 (Tex. App.—Corpus Christi 1994, no writ) (citing *Albright v. Tex. Dep't of Hum. Servs.*, 859 S.W.2d 575, 578 (Tex. App.—Houston [1st Dist.] 1993, no writ)).

Therefore, Miller performed a discretionary act when he made allegedly defamatory remarks in the course of his communications with Plaintiff's employer while investigating a multi-state healthcare fraud scheme. This first element is proven.

### (2)   Within the scope of authority

As for the second element, Miller asserts that he was acting within the scope of his authority as a privacy and security officer for PEIA when he communicated with Plaintiff's employer and made the allegedly defamatory statements about Plaintiff's possible involvement in the healthcare-fraud scheme.

"An official acts within the scope of her authority if she is discharging the duties generally assigned to her." *Chambers*, 883 S.W.2d at 658. Even if the specific act that forms the basis of the suit were wrongly or negligently performed, this would not take it outside of the scope of the employee's authority. *Tex. Dep't of Pub. Safety v. Tanner*, 928 S.W.2d 731, 735 (Tex. App.— San Antonio 1996, no writ).

As a privacy and security officer for PEIA, Miller was tasked with investigating "fraud, waste, and abuse" on behalf of the State of West Virginia, doc. 55, at 32–33, as it relates to the agency and its members. (Doc. 67-1, at 212–14.) In doing so, Miller was responsible for investigating the propriety of concerns or complaints that PEIA was notified of and assessing a response to such complaints of fraud, waste, and abuse. See doc. 55, at 31–32. One such episode of fraud, waste, and abuse involving PEIA and its members was the multi-state healthcare-fraud scheme that Plaintiff was initially thought to be involved in.

Plaintiff responds, however, that Miller was not acting within the scope of his authority because he lied when he communicated to Plaintiff's employer, which violates his duties as an investigator. The Court is not convinced by Plaintiff's argument.

Plaintiff rightfully notes that PEIA's corporate representative stated that Miller was required "to be honest in carrying out his duties." (Doc. 67, at 11 (quoting doc. 67-1, at 215)). But Plaintiff fails to create a genuine dispute of fact as to whether Miller initially lied to Plaintiff's employer in the communications associated with the investigation. Specifically, the record disproves the three lies that Plaintiff purports Miller told during the communications.

First, Plaintiff claims that Miller lied when he forwarded an email to Plaintiff's employer, which included a statement that it was his belief that Plaintiff was or is involved in mail and wire fraud as it relates to a potential prescription-fraud scheme. As the same email chain indicates, however, it actually was Miller's belief that Plaintiff was involved in the prescription-fraud scheme they were investigating at the time based on her irregular prescribing patterns and subpoenaed records showing prescription-billing discrepancies. (Doc. 67-1, at 4–7.) Even if Miller's statements ended up being false, their eventual falsity does not create an issue of fact as to whether Miller was, by stating a falsehood, not acting within the scope of his authority, because Miller was performing the general duties that were assigned to him. *See Tanner*, 928 S.W.2d at 735 (stating "[even] if a specific action is wrong or negligent, an officer acts within the scope of his authority when performing the general duties assigned.") Therefore, Miller did not deviate from his duties in making this statement because he was following his generally assigned duties as an investigator.

Second, Plaintiff contends that Miller lied when he informed Plaintiff's employer that the State of West Virginia had filed a complaint against Plaintiff with the West Virginia Board of Medicine for "similar concerns" when the complaint actually dealt

solely with violations of West Virginia telehealth regulations. But the contents of the complaint filed with the West Virginia Board of Medicine reveal that PEIA accused Plaintiff of both violating telemedicine laws and being involved with the holistic prescription-fraud scheme, not just the former. See doc. 55, at 74-75. As a result, Miller did not lie when he informed Plaintiff's employer that the complaint dealt with "similar concerns" to the prescription-fraud scheme that he had generally outlined.

Third, Plaintiff asserts that Miller lied when he told Plaintiff's employer that he wanted to speak with her individually because he knew that Plaintiff had retained counsel, and thus, he had no intention of speaking with Plaintiff because doing so would have been improper without her lawyer's being present.[9] However, Plaintiff fails to identify any evidence, and thus create a factual dispute, as to whether Miller knew Plaintiff had retained counsel when he communicated with Plaintiff's employer, or that he had no intention of discussing the investigation with Plaintiff individually. See doc. 67-1, at 4, failing to include Plaintiff's counsel on the email to Plaintiff's employer; see also id., at 125, failing to explicitly state that counsel and Miller had communicated prior to Miller's email exchange with Plaintiff's

---

[9] Plaintiff also argues that this is evidence of Miller's bad faith in communicating with Plaintiff's employer.

employer. Even if Miller had knowledge that Plaintiff had retained counsel, this falls far short of proving that Miller had no intention of speaking with her, or her counsel. Hence, Plaintiff fails to raise a factual dispute as to whether Miller deviated from his scope of authority by lying to Plaintiff's employer in the course of their communications.

Overall, Miller was acting within the scope of his authority as an investigator for PEIA when he communicated with Plaintiff's employer and made allegedly defamatory remarks. The second element of official immunity is satisfied.

### (3)   On a good-faith basis

With respect to the third element, Miller argues that he was acting in good faith when he communicated with Plaintiff's employer because a reasonably prudent official in Miller's place could have believed that reaching out to Plaintiff's employer was necessary to facilitate PEIA's healthcare-fraud investigation.

To determine whether an official acted in good faith, a court should use the objective standard adopted in *Chambers* and ask whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information that he possessed when the challenged conduct occurred. *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426 (Tex. 2004) (citing *Chambers*, 883 S.W.2d at 656)).

The standard of good faith is not a test of carelessness or negligence, or a measure of an official's motivation. *Id.* (citation omitted.) The inquiry is not into "what a reasonable person would have done," but into "what a reasonable [person] could have believed." *Id.* (citing *Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002)). The good-faith standard is analogous to an abuse-of-discretion standard that protects "all but the plainly incompetent or those who knowingly violate the law." *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 643 (Tex. 2015).

There is substantial evidence in the record supporting the conclusion that a reasonably prudent official in Miller's position could have believed that contacting Plaintiff's employer to discuss PEIA's healthcare-fraud investigation and his suspicions regarding Plaintiff was a necessary step in the investigatory process. First, Plaintiff was affiliated with three separate pharmacies that PEIA had identified as problematic throughout the course of the investigation. See doc. 55, at 18. Second, for certain types of drugs, her prescriptions would flow through only one pharmacy. *Id.*, at 19-20. Third, for certain prescriptions that she did write, Plaintiff would not bill for an office visit, which is indicative of rebating, a practice that violates federal law. *Id.*, at 20. Finally, PEIA followed up with certain patients who allegedly saw Plaintiff for medical services who indicated they

did not recall speaking to her or any medical doctor. *Id.*, at 25. Armed with this information, it is not surprising that a reasonably prudent investigator could have believed that contacting Plaintiff's employer was a necessary step to facilitate its investigation into the healthcare-fraud scheme and Plaintiff's potential involvement.

In response to Miller's argument, Plaintiff contends that three circumstances underscore Miller's bad faith in communicating with her employer. First, Plaintiff asserts that Miller's accusations of mail fraud, wire fraud, and prescription-pharmacy fraud were unnecessary if his purpose for contacting Plaintiff's employer was to obtain her contact information. However, the record reveals that Plaintiff's employer pressed Miller on the necessity of obtaining Plaintiff's information and basic details regarding the underlying investigation. See doc. 55, at 25–26. In this scenario, and in order to fulfill the duty of conducting the investigation honestly, it is reasonable that an investigator might conclude that he should share minimal details about the nature and scope of the investigation to facilitate obtaining contact information of a person suspected of involvement. This fails to create a dispute of fact as to whether Miller acted in bad faith.

Second, Plaintiff argues that: (1) Miller's failure to follow

up with Plaintiff by setting up a meeting, and (2) the timing of Miller's contacting Plaintiff's employer, both show that Miller's intentions were suspect.[10] Both of these circumstances are logistical considerations throughout the investigatory process, not evidence of plain incompetence or a knowing violation of the law. *See Bonilla*, 481 S.W.3d at 643. A reasonably prudent investigator might have made the decision not to follow up with Plaintiff, or contact her later in the process, given the traction of the investigation or its sheer size.[11] Therefore, these circumstances fail to create a factual dispute as to whether Miller acted in bad faith.

Because Miller provides overwhelming evidence that a reasonably prudent official facing similar circumstances might have decided that contacting Plaintiff's employer was a necessary step to further the investigation into the healthcare-fraud scheme, and Plaintiff produces none to the contrary, the third element of official immunity is met. Accordingly, seeing that all

---

[10] The Court combines its analysis of Plaintiff's final two arguments because they are disposed of on the same basis.

[11] It is noteworthy that the investigation Miller participated in was a large-scale operation involving law-enforcement agencies on both the state and federal levels, as well as multiple regulatory bodies across the country. See doc. 54, at 9–10. It also included civil, professional, and criminal elements. Given the scope and complexity of this investigation, it is not surprising that an investigator in Miller's position would either be preoccupied, tardy, or both. *See Chambers*, 883 S.W.2d at 656 (clarifying that the standard for good faith considers "a reasonably prudent officer, under the same or similar circumstances.")

elements of his official-immunity defense are met, Miller is deserving of summary judgment on this point, and Plaintiff's claims against him in his individual capacity are barred.

### D. Absolute privilege based on communications in anticipation of judicial/quasi-judicial proceedings

Fourth, Miller avers that the communication that he had with Plaintiff's employer was undertaken in anticipation of judicial or quasi-judicial proceedings, which makes them absolutely privileged and bars Plaintiff's claims against him. He is correct.

The proper administration of justice requires full and free disclosure of information as to criminal activity both by the public and by participants in judicial proceedings. *James v. Brown*, 637 S.W.2d 914, 916–17 (Tex. 1982) (per curiam). To facilitate this policy, Texas recognizes an absolute privilege that is applicable to the communications underlying some tort suits. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987); *see also Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021) (noting that the privilege applies to "any tort litigation based on the content of the communication") (citation omitted.)

The judicial-proceedings privilege is an absolute privilege that normally covers "any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the

proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *Landry's, Inc.*, 631 S.W.3d at 46. But the privilege can also extend to statements made "preliminary to a proposed judicial proceeding." *Id.* at 47 (citing *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654–55 (Tex. 2015)). And it can cover the right of parties and counsel "to communicate with [a quasi-judicial body] touching the matters under [its] consideration." *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 913 (Tex. 1942). The communication must, however, be made "in serious contemplation of a judicial proceeding, not on the bare possibility that such a proceeding might occur." *Writt*, 464 S.W.3d at 655.

Here, the record establishes that, at the time that Miller communicated with Plaintiff's employer, PEIA was investigating a substantial healthcare-fraud scheme with civil, criminal, and professional-licensure consequences. See doc. 55, at 146–48, for communications between the United States Department of Justice; the California Department of Consumer Affairs; the prosecutor's office of Kanawha County, West Virginia; the West Virginia Attorney General's Office; the West Virginia Board of Medicine; and the Medical Board of California on whether judicial action should be taken against Plaintiff based on her potential involvement in the fraud scheme. Also, at the time that Miller communicated with

Plaintiff's employer, there was a pending West Virginia Board of Medicine proceeding regarding Plaintiff's medical license that was directly related to PEIA's investigation. See *id.*, at 86-92. An additional proceeding with the Medical Board of California was pending around the time that Miller communicated with Plaintiff's employer. See *id.*, at 151. Further, Miller's findings from his conversation with Plaintiff's employer were to be reported to the appropriate oversight authority, including a licensure board, a prosecuting attorney, or "a host of different agencies." *Id.*, at 15-16. This evidence cumulatively indicates that Miller's statements to Plaintiff's employer were made during the course of, and solely for the purpose of, an investigation, where a multitude of judicial and quasi-judicial proceedings against Plaintiff were being seriously contemplated. *See Writt*, 464 S.W.3d at 655.

In response to Miller's assertion of the privilege, Plaintiff analogizes Miller's statements to "publicity statements" to a non-judicial entity. In doing so, Plaintiff relies on *Landry's*, arguing that Miller's contact with Plaintiff's employer was solely for the purpose of publicizing his false accusations, not fact-finding for PEIA's investigation.

But Plaintiff's attempted analogy is a far cry from the facts of *Landry's*. In *Landry's*, the defaming party delivered disparaging communications to the defamed party and the United States

Department of Interior, as was required under the Endangered Species Act to enable the defaming party to file suit. 631 S.W.3d at 44. The Texas Supreme Court determined that the delivered communication was protected by the judicial-proceedings privilege because it was "necessary to set the judicial machinery in motion." *Id.* at 50. However, following the delivery of the disparaging communications to the appropriate authorities, the defaming party then released those communications to the media along with a press release for publicity purposes. *See id.* at 44. This, the court concluded, is the moment the defaming party lost the shield of its privilege. *See id.* at 50.

Conversely, Miller's statements to Plaintiff's employer were purely investigatory on behalf of PEIA, not an effort to garner publicity. See doc. 67-1, at 4, where Miller indicates that the purpose of his email is to discuss PEIA's investigation into Plaintiff's involvement with the healthcare-fraud scheme. Plaintiff's reliance on *Landry's* is misguided and fails to persuade the Court that Miller is undeserving of summary judgment.

Accordingly, Miller is shielded by the judicial-proceedings privilege because his comments to Plaintiff's employer were directly related to PEIA's investigation into Plaintiff and the healthcare-fraud scheme at a time in which proceedings against Plaintiff were being seriously contemplated. He is deserving of

summary judgment on this argument, and his motion for partial summary judgment (doc. 53) will be granted.

## CONCLUSION

For these reasons, the Agency Defendants' motion for summary judgment (doc. 71) should be, and it is hereby, **GRANTED.** In addition, Miller's motion for partial summary judgment (doc. 53) should be, and it is hereby, **GRANTED.** Plaintiff's claims are **DISMISSED with prejudice.**[12]

SIGNED June 21, 2023.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[12] The Court notes that some of Defendants arguments (e.g., sovereign immunity) go toward the Court's lack of subject-matter jurisdiction, not merits relief. *See Koehler v. United States*, 153 F.3d 263, 267 (5th Cir. 1998) ("sovereign immunity is jurisdictional.") While this would normally require that the Court dismiss Plaintiff's claims without prejudice, other arguments that Defendants raise (e.g., the statutes of limitations), and on which the Court grants summary judgment, go toward the merits of Plaintiff's claims and reveal incurable defects in them. Accordingly, a dismissal with prejudice is appropriate.

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT – PAGE 34